{¶ 76} I respectfully dissent from the majority and would reverse the decision of the trial court.
 {¶ 77} We impose great safeguards to ensure that persons who intend to dispose of property in the event of their death do so with a formality and clarity unparalleled in other areas of the law. We require testators to express unequivocal knowledge of the nature and extent of their property, the natural heirs of their body, and the plan they have for disposition of said property, free of any undue influence or duress. *Page 18 
 {¶ 78} However, there are times when we encounter the convenience of a pre-mortem power of attorney that is used to transfer and convey assets. These documents are often sought for a variety of reasons, such as avoiding probate, avoiding a guardianship of the person and/or estate, saving taxes, or even making it "easier" on the person who is no longer able to care for him/herself in the manner in which they are accustomed. There are many cases where the reasons are appropriate, and the power appropriately used; however, there are instances where the initial intentions are noble and proper, but problems arise in the use or abuse of the power.
 {¶ 79} One would hope that in most cases, the person holding the power of attorney would always have the best intentions and act only in a manner consistent with the wishes of the grantor. However, the sacrifice in the granting of the power is the loss of those safeguards that we insist upon in the execution of a last will and testament. Therefore, particularly in those cases where execution of the power of attorney contains no safeguards whatsoever, we must review transfers using this "power" with great scrutiny.
 {¶ 80} Although his wife, Joanne, acknowledges being paid for some of the services, such as cooking, there appears to be little dispute that Arne Niemi provided great care and comfort for his Aunt Miriam. However, the manner in which Miriam's real estate was transferred to him and his wife should not be permitted nor condoned by the law.
 {¶ 81} The birth of the power of attorney and the deed in question was established through the testimony of Attorney Gessner and raises cause for concern. At the hearing, Attorney Gessner testified that his office prepared both documents. He *Page 19 
further testified that while Miriam was "still at home," he had some conversations with her by telephone. During one conversation, she discussed a power of attorney and also asked Attorney Gessner to prepare a deed to Arne. Attorney Gessner testified that he had known Arne since he was in high school and considered him a friend.
 {¶ 82} Although he testified that he spoke with Miriam, Attorney Gessner stated that the last time he talked to her was November or December of 2005 and that conversation was not enough of an event for him to make note. Further, Attorney Gessner did not review the power of attorney with Miriam and was not present when it was signed.
 {¶ 83} Completely absent from the record is any suggestion that Miriam was competent when she signed the power of attorney, understood the consequences of what she was signing, and understood the nature and extent of what she was executing. The fact that this may have been a "stock" power of attorney, signed without any real explanation or discussion of its consequence, is buttressed by the fact that the power granted in paragraph 26 specifically includes the power to make gifts to "my spouse," even though Miriam was never married and had no children. Under the circumstances of this case, it certainly suggests she did not read the document, let alone understand it.
 {¶ 84} Furthermore, the execution of the power of attorney is unsettling. The power of attorney was executed on January 24, 2006, at a nursing home where Miriam was admitted as a resident. It was notarized by a nursing home employee. Arne signed the power of attorney as a witness. While Arne's signature appears on the power of attorney as a witness, according to his wife, Arne did not, in fact, witness *Page 20 
Miriam's signature. According to Joanne, only she and the notary were in the room when it was signed.
 {¶ 85} Because Arne has since passed away, his credibility must be judged by his acts and deeds leading up to these events. Arne's purported witnessing of this power of attorney would likely fall somewhere in the spectrum of misfeasance to falsification. This alone, however, should not invalidate an otherwise properly-executed power of attorney.
 {¶ 86} On the other hand, the deed, which is replete with issues, resolves the instant situation.
 {¶ 87} At the outset, the deed indicates it is exempt from transfer tax, which is a clear indication no consideration was given for the transfer. (The fact this was a gift was also acknowledged by appellee's counsel at oral argument.)
 {¶ 88} Further, when Attorney Gessner actually prepared the deed, he did so because Arne stopped by the office and asked him to "go ahead and get that deed ready." This was done a month or two after the birth of the power of attorney. It was Attorney Gessner's understanding that Arne came by his office to pick up the deed.
 {¶ 89} Subsequently, Arne signed the deed as Miriam's power of attorney. Yet, there is no explanation as to why he did not sign it in the presence of Attorney Gessner, or why he did not sign the deed in the attorney's office when he picked it up. Instead, he executed the deed at a branch office of Cortland Bank.
 {¶ 90} The face of the deed reflects that Arne signed as power of attorney for Miriam on March 8, 2006. On March 5, 2006, three days before it was purportedly signed by Miriam, David Johnson, the notary, indicated that "Miriam E. Niemi" *Page 21 
personally appeared before him and "acknowledged the signing thereof to be her voluntary act and deed." While there was some discussion at the hearing about a conversation with Mr. Johnson, who apparently indicated those dates should have been one and the same, there was no indication if the correct date was the 8th or the 5th of March.
 {¶ 91} Regardless of any other issues in this case, this purported acknowledgement destroys the effect of this deed. The purpose of the notary clause is to acknowledge that the person signing the instrument is of sound mind and memory; that the act of signing is their free act and deed; and that the signature is not made under duress.
 {¶ 92} In this case, Arne signed the deed as power of attorney for Miriam. His signature was not, and never has been, notarized or acknowledged. This deed should have never been accepted for recording.
 {¶ 93} There are citations in appellee's brief, the trial court ruling, and the majority opinion that stand for the proposition that a deed is valid despite defects in the acknowledgement. However, those cases are all limited to disputes between the grantor and grantee, which is inapposite to the instant situation.
 {¶ 94} In this case, Arne was both the grantor and grantee. Appellant was neither. The failure of any acknowledgement whatsoever of Arne's signature renders the deed ineffective to pass legal or equitable title.
 {¶ 95} The Eighth District Court of Appeals addressed this situation in Marshall v. Scalf, where the decedent, on videotape, acknowledged his signature of a quitclaim deed conveying his home. Marshall v.Scalf, 8th Dist. No. 88708, 2007-Ohio-3667, *Page 22 
at ¶ 11. The notary admitted the quitclaim deed was acknowledged based upon her viewing the decedent sign the quitclaim deed on video, not in person. Id. The Marshall court stated:
 {¶ 96} "As to the deed, a proper notarization is required. R.C. 5301.01. R.C. 147.53 sets forth the requirements for taking an acknowledgment as follows:
 {¶ 97} "`The person taking the acknowledgment shall certify that:
 {¶ 98} "`(A) The person acknowledging appeared before him and acknowledged he executed the instrument;
 {¶ 99} "`(B) The person acknowledging was known to the person taking the acknowledgment, or that the person taking the acknowledgment had satisfactory evidence that the person acknowledging was the person described in and who executed the instrument.'
 {¶ 100} "In [Marshall], Burke admitted that her acknowledgment that the decedent signed the deed in her presence was false; she stated that she acknowledged the document after viewing the now missing videotape. Accordingly, upon failure of the acknowledgment, the deed is not valid, and the property is required to pass through the decedent's estate." Id. at ¶ 19-23.
 {¶ 101} R.C. 147.541 defines "[a]cknowledge before me" as:
 {¶ 102} "(A) The person acknowledging appeared before the person taking the acknowledgment;
 {¶ 103} "(B) He acknowledged he executed the instrument;
 {¶ 104} "(C) In the case of:
 {¶ 105} "* * * *Page 23 
 {¶ 106} "(4) A person acknowledging as principal by an attorney in fact, he executed the instrument by proper authority as the act of the principal for the purposes therein stated;
 {¶ 107} "* * *
 {¶ 108} "(D) The person taking the acknowledgment either knew or had satisfactory evidence that the person acknowledging was the person named in the instrument or certificate."
 {¶ 109} The facts in the instant case are far more compelling than those in Marshall. It is clear from the document that there was never a proper acknowledgment of any signature. Mr. Johnson attests that he witnessed Miriam sign the deed, but he obviously did not. If he had attested to the fact that he saw Arne sign the deed, then perhaps I could agree with the majority position that this was an "inadvertent" violation of the method to acknowledge the signature of someone using a power of attorney. However, the fact remains that the face of the deed reflects a completely ineffective acknowledgment.
 {¶ 110} Also disturbing is the absence from the record of any explanation why Miriam did not sign the deed herself. She was apparently capable of doing so. As testified by Joanne, they did not feel any real rush to get the deed done, as they had no idea Miriam was going to pass.
 {¶ 111} In addition to the deed problems, it is important to review the powers given to the power of attorney at issue. While the power of attorney can be described as including typical or standard powers, there is a clear restriction on the ability to make gifts. As stated by the terms of the power of attorney, there is an unequivocal restriction *Page 24 
on any gift, limited to $10,000 annually to individuals, or, if a gift to charity, 20% of Miriam's annual adjusted gross income.
 {¶ 112} Using the power of attorney, Arne made a gift of Miriam's house, with a value of over $90,000, to himself and his wife. As a result, it is unnecessary to analyze or consider the issue of "undue influence." Even if Arne was Miriam's sole surviving heir and beneficiary under her will, there simply was no authority to do what he did. I cannot fathom a title company would give a title guarantee to bless any transaction based on a deed such as the one in the instant case.
 {¶ 113} Furthermore, it is clear that Ohio courts view any such transaction with disdain.
 {¶ 114} "The law is zealous in guarding against abuse of such a relationship. * * * Any transfer of property from a principal to his attorney-in-fact is viewed with some suspicion. * * * Self-dealing transactions by a fiduciary are presumptively invalid. * * * In such a case, the attorney-in-fact is obligated to demonstrate the fairness of his conduct. * * * (`It is a most egregious violation of a fiduciary's duty to abuse the relationship through acts of self-dealing.')."Bacon v. Donnet, 9th Dist. No. 21201, 2003-Ohio-1301, at ¶ 30. (Internal citations omitted.)
 {¶ 115} In fact, over 100 years ago, the Supreme Court of Ohio stated:
 {¶ 116} "This court has frequently declared with emphasis its disapproval of all schemes and devices by which trustees may seek, even with honest motives, to acquire in their own right, the trust property committed to their hands for administration in the interests of beneficiaries whose rights should be guarded with scrupulous fidelity. Any *Page 25 
relaxation of this salutary principle would be full of peril and uncertainty." Caldwell v. Caldwell (1888), 45 Ohio St. 512, 523. (Citations omitted.)
 {¶ 117} Based on the foregoing, I would reverse the ruling of the trial court and declare the real estate to be a part of Miriam's estate. *Page 1